**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GARTNER, INC., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. _____ |
| | ) | |
| CRAIG RILEY, an individual, and SALES | ) | |
| BENCHMARK INDEX, LLC d/b/a SBI, THE | ) | |
| GROWTH ADVISORY, a Delaware | ) | |
| corporation, | ) | |
| | ) | September 12, 2024 |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff Gartner, Inc. ("Gartner") for its Verified Complaint (the "Complaint") against Defendants Craig Riley ("Riley") and Sales Benchmark Index, LLC d/b/a SBI, The Growth Advisory ("SBI") (collectively, the "Defendants") states as follows:

## INTRODUCTION

1.      In an effort to "jump the line" in order to unlawfully compete, SBI targeted Craig Riley, a former Gartner Analyst and Chief of Research, to grow its newly launched advisory and research business segment, SBI Pro.  SBI is building and expanding SBI Pro with the critical help of former Gartner employees who worked for Gartner in its specialized and niche Sales and Customer Service ("SCS") practice.  SBI itself repeatedly touts Riley's, and others', former Gartner experience and the benefit such experience brings to SBI and its SBI Pro offering.  In so doing, SBI has unlawfully induced Riley to breach his contract with Gartner and is seeking to leverage Gartner's trade secrets.

2.      For his part, Riley defected from Gartner to join SBI and help build and expand SBI's directly competing business.  Riley is armed with the tools, experience, and Gartner

information needed to grow SBI's directly competing business, which explains why he lied to his manager and colleagues about not having another job when he voluntarily resigned from Gartner.

3.      Indeed, Riley is a former Chief of Research for Gartner.  Through this role, Riley knows and understands every aspect of Gartner's SCS research and content offerings, as well as its client base.  Riley had access to Gartner's proprietary research offerings, client information, client feedback, internal data, research and forecasting informing market and client trends, and ways to drive demand for Gartner's products.  Riley was also intimately involved and responsible for research strategy and forward-looking strategic planning.

4.      Riley also served as a Gartner Analyst.  In this role, Riley built important and long-standing relationships with various clients, prospects, and vendors, giving him prime access to market research, feedback, and market trends.  He also gained intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.

5.      Riley is primed to leverage this information and these relationships to grow the SBI Pro business.  SBI strategically hired Riley for this exact reason.  SBI already employs two former Gartner leaders, who worked closely with Riley, and who are knowledgeable of the post-employment restrictions contained in Gartner's employment agreements.  In hiring Riley, SBI intentionally interfered with Riley's valid and enforceable Gartner employment agreement.  For his part, Riley knowingly breached his agreement, and continues to do so, putting Gartner's confidential and trade secret information at risk.

6.      By using Riley's knowledge and relationships, SBI does not have to expend the time and resources to build products and services intended to compete with Gartner's products and

services and can instead unfairly rely on Gartner's work and years of compiled research and proprietary information.

7.    Defendants' unlawful actions must be enjoined before they can cause further irreparable harm to Gartner's legitimate business interests, including its trade secrets, proprietary and confidential information, and client and employee relationships.

## PARTIES

8.    Gartner, Inc. is a Delaware corporation with its principal place of business located at 56 Top Gallant Road, Stamford, Connecticut 06902.

9.    SBI is a Delaware corporation.  SBI is headquartered in Southlake, Texas, with its principal office located at 550 Reserve Street, Suite 190, Southlake, Texas 76092.

10.    Craig Riley is a former Gartner employee.  Upon information and belief, Riley is a New Mexico resident.  During his Gartner tenure, Riley reported to Jenny Sussin, who is located in Connecticut.  Riley also regularly worked and interacted with Connecticut-based employees. Riley also entered into an employment agreement with Gartner in 2022, which is governed by Connecticut law and contains Connecticut forum and choice of law provisions.  The claims asserted in this Complaint are based on, among other things, the work Riley performed for Gartner, his access to and knowledge of Gartner information, and his interactions with Gartner's Connecticut-based employees.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because Gartner asserts claims under the Federal Defend Trade Secrets Act. 18 U.S.C. § 1836, *et seq.*

SG-21582300v1

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because, pursuant to Riley's employment agreement with Gartner, the parties consented to the exclusive jurisdiction of the federal and state courts of Connecticut in the event of a breach or threatened breach of such agreement, and because SBI has tortiously interfered with a contract governed by Connecticut law. Gartner's confidential and trade secret information, to which Riley had access, is also stored in Connecticut and Riley regularly worked with Gartner's Connecticut-based employees.

## **GENERAL ALLEGATIONS**

### **Gartner's Business**

13.     Gartner is a global research and advisory firm that provides clients with indispensable and enterprise-wide insights, advice, and tools to help them achieve their mission critical priorities. Gartner delivers actionable, objective insight to executives and their teams. Gartner's expert guidance and tools enable faster, smarter decisions and stronger performance on an organization's mission critical priorities.

14.     Gartner's Research and Advisory business delivers independent and objective research, advice, and guidance to leaders across an enterprise through subscription services that include on-demand access to published research content.  Gartner delivers its products and services globally through several distinct business segments.

15.     Within the Research and Advisory segment, there are myriad industry groups that specialize in distinct industries or market segments.  These groups create must-have research, market predictions, and best practices for C-level executives and their teams who operate within those industries and market segments.

4

16. Gartner distinguishes itself from its competitors based on, among other things, its talented employees and delivery of high-quality products and services that it has developed through significant time and expense.

17. Riley was part of Gartner's SCS practice, which Gartner acquired through its acquisition of CEB, Inc. ("CEB") in 2017. This vertical focuses on providing research and advisory content and services to Chief Sales Officers ("CSO") and their teams. Gartner's SCS vertical provides sales leaders with tools and innovative of-the-moment research to, among other things, increase seller productivity, improve, and maximize sales teams' strategic plans, deliver customer-led growth, and ensure sales processes are aligned with a business' commercial goals.

18. SCS is specialized and unique due to its smaller size and intimate team of Gartner employees dedicated to sales-specific content, research, and advisory services.

**Riley's Employment with Gartner**

19. Riley was originally hired by CEB in April 2015 and became a Gartner employee in 2017 through the CEB acquisition. Riley began his career as a junior researcher in SCS, eventually receiving multiple promotions, including to Director Analyst and Sr. Director Analyst. Throughout his career, Riley worked exclusively in Gartner's specialized SCS vertical and was intimately familiar with all aspects of this business.

20. Both prior to and for a period of time after the CEB acquisition, SCS was led by Nick Toman ("Toman"). Toman has since resigned from Gartner and, upon information and belief, joined SBI in April 2021 as its Chief Product and Transformation Officer.

21. As an Analyst, Riley was a contributor and thought leader within SCS and regularly advised Gartner clients via briefings and conferences on SCS topics. Riley provided expert

guidance and assistance to various sales leaders throughout his tenure to enable faster, smarter decisions and stronger performance on a client organization's most critical sales-related priorities.

22.    Gartner afforded Riley with access to Gartner's research methods, tools, and insights, as well as research, input, and data gathered from Gartner's SCS clients.  Riley regularly interfaced with Gartner clients to provide customized and specialized insight, advice, and guidance for his specialized group of sales leaders and CSO clients.

23.    Each of Gartner's research and advisory practices has an independent Chief of Research dedicated to the specific practice's goals, clients, objectives, and deliverables.  The Chief of Research is essentially the "Head of Content" for each Gartner practice.

24.    Riley was appointed as Chief of Research for SCS upon Toman's resignation from Gartner in April 2021, a role he took on in addition to his existing Analyst duties.  It was unusual to select a non-director level Analyst for a role as critical as Chief of Research, but SCS is intimate and specialized, and Riley was already deeply familiar with many strategic aspects of the practice, making him a desirable candidate for the role.

25.    As Chief of Research, Riley was responsible for developing and building relationships with Gartner's SCS clients, namely CSOs and their teams.  This also included maintaining legacy CEB clients that Gartner acquired, for which the years of service Riley previously provided those same clients was critical.  Riley worked directly with Gartner's SCS clients to discuss research trends and needs.

26.    Because of this role, Riley has full and unfettered knowledge of the entire SCS client base, including the CSOs who Gartner has identified as its target growth audience and top priorities for expanding its client base.  Riley was also not just aware of who SCS's clients are, but also which clients make the largest investment in Gartner's research and advisory services.

Because of the specialized nature of the SCS business, there is a small pool of clients who spend a significant amount on these services—and Riley knows precisely who they are.

27.    In his Chief of Research role, Riley was also responsible for developing SCS's "research agenda" for the year (including for 2024), which identifies SCS's key initiatives based on the research Gartner has compiled from its clients, the industry at large, and other data collected through Gartner's research methodologies.  The research agenda is Gartner's roadmap of content, topics, and themes for an upcoming year, which focuses on trends and core issues identified by Gartner's clients and extensive research.

28.    Riley was also responsible for mapping out SCS's content strategy each year, including the structure of the content, the audience, and the research involved in creating such content.  Riley has knowledge of the foundational research SCS plans to use for its future strategy planning as well as the historical research and data SCS relied on to build existing content.

29.    In order to craft the research agenda and map out SCS's yearly content, Riley was intimately familiar with why certain initiatives are successful (or not) and the strategies Gartner implements to capitalize on successful content or recalibrate unsuccessful content.  Riley understands the various levers in place relating to what CSOs and other sales leaders respond to and what matters to them, and, of course, what does not.  And, with this, Riley understands why Gartner covers certain markets and the strategic reasons for doing so.

30.    Part of Gartner's offerings include its Magic Quadrants ("MQ"), which are a series of market research reports based on Gartner's proprietary qualitative data analysis, which demonstrate market trends for a variety of industries.  A significant amount of the data analyzed in the MQs is gathered through Gartner's vendor briefings, where Gartner's analysts and advisors speak with various industry vendors in connection with preparing the MQs.  As a former Chief of

Research for SCS, Riley is aware of Gartner's three-year pipeline for SCS MQs and its forecasted MQ planning, as his Chief of Research duties included being responsible for reviewing and approving the markets MQs would cover.

31.     Riley also helped strategize on and draft the Keynote presentation for SCS's largest annual client event in 2023, the CSO & Sales Leader Conference (the "SCS Conference"), which necessitated intimate understanding of the research and data used as the foundation for the presentation.  The SCS Conference is SCS's largest client prospecting event of the year and is critical for both growth and retention of Gartner's SCS client and prospect base.

32.     As it relates to the SCS Conference, as well as additional in-person retreats for certain Gartner SCS clients, Gartner sends out survey questions prior to the event regarding ongoing research, trends, and client needs.  The survey responses are compiled and synthesized and then premiered at the client event.  As Chief of Research, Riley managed this entire process and was intimately familiar with the various survey outcomes and underlying research.

33.     As Chief of Research, Riley was also a member of Gartner's Senior Content Leadership Board (the "SCL Board").  The SCL Board is comprised of each Chief of Research from each of Gartner's research and advisory practices, and its purpose is to provide a platform for these employees to discuss macro trends impacting Gartner's entire research and advisory agenda around the world.  As a member of the SCL Board and a participant in these meetings, Riley had unparalleled insight into the other research agendas around the company in every practice, as well as the strategy behind each initiative.

34.     Riley was promoted to Senior Director, Analyst in April 2023, while still serving as Chief of Research for SCS.  Riley held this role until he unexpectedly resigned in October 2023.

35.     Riley received a raise with his promotion to Senior Director, Analyst, as well as the ability to earn a higher bonus commensurate with his increased base salary.

36.     In his dual roles as Senior Director, Analyst and Chief of Research, Riley had access to and a deep understanding of Gartner confidential and trade secret information, including its product and service offerings (past, present and future); client and prospect identities; client entitlements; pricing and structure of products and services; client engagement and purchasing information; Gartner's research agendas across each vertical; key SCS initiatives and strategy; and future SCS planning and strategic forecasting.

**Riley's Agreement Regarding Certain Conditions of Employment**

37.     Because Gartner highly values its products, services, strategies, processes, tools, and insights, and because Gartner also provided Riley with access to such information, Riley entered into an Agreement Regarding Certain Conditions of Employment (the "ARCCE") to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.

38.     Gartner first issued Riley an ARCCE in connection with his selection for a Senior Principal Analyst role in October 2018.  Riley signed the ARCCE on October 22, 2018.

39.     Gartner issued Riley another ARCCE in connection with its grant of Restricted Stock Units (RSUs) to him on February 9, 2022.  Riley accepted the RSUs and the terms of the ARCCE on March 4, 2022 via Gartner's E-Trade Platform.  *See* ARCCE attached as **Exhibit A** and confirmation of Riley's electronic acceptance attached as **Exbibit B**.

40.     Gartner does not issue RSUs to every Gartner employee, but rather RSUs are reserved for higher-level employees or those Gartner deems critical to its operations, such as a Chief of Research like Riley.

41.     The confidentiality and non-disclosure provisions of the ARCCE prohibit Riley from using or disclosing Gartner's or its clients' Confidential Information (as defined below).

42.     The ARCCE forbids Riley from using or disclosing Gartner's or its clients' Confidential Information other than solely in the furtherance of Gartner's business and further prohibits Riley from taking any actions that would constitute or facilitate the unauthorized use or disclosure of Confidential Information. *See* Ex. A, ¶ (1)(b)(i)-(iv).

43.     The ARCCE defines "Confidential Information" in Section 1(a) as:

(i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) databases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management, and (xviii) non-public information provided to the Company by its clients. Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by Employee in the course of employment (collectively, the "Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

Ex. A, ¶ 1(a).

44.     The ARCCE's non-competition provision provides, in pertinent part:

**6.     Non-Competition.**

…

(b) Non-Competition.

Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever,

10

Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, prospects, or vendors to discontinue or diminish their business with the Company, or otherwise interfere with or adversely modify their relationships with the Company.

Ex. A, ¶ 6(b)(i)-(ii).

45.     The ARCCE defines "Competitive Acts" as follows:

6(a)(i) . . . Competitive Acts shall mean: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

Ex. A, ¶ 6(a)(i).

46.     The ARCCE's employee non-solicitation provision provides, in pertinent part:

(c) Non-Solicitation.  Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. A, ¶ 6(c).

47.     By accepting the terms of the ARCCE, Riley agreed, among other things, that all

information related to the operation of Gartner's business, including, without limitation,

knowledge of Gartner's assets and other information he obtained in the course of his employment, are confidential and trade secrets of Gartner and shall remain the property and trade secrets of Gartner. Riley further acknowledged any disclosure of Gartner's Confidential Information would cause irreparable and material damage to Gartner. *See* Ex. A, ¶ 9.

48.    Riley also agreed if he violated the ARCCE's terms, Gartner would be entitled to, among other things, immediate injunctive relief. *See* Ex. A, ¶ 9(a). Riley further agreed to the ARCCE's tolling provision, providing "the limitation periods for the restrictions contained herein shall be tolled for the length of time during any period in which any of the restrictions are violated." Ex. A, ¶ 6(f).

49.    The ARCCE is governed by Connecticut law. *See* Ex. A, ¶ 15. Riley also consented to jurisdiction of any disputes arising in the event of a breach of Sections 1, 2, 4, 5, or 6 of the ARCCE in a state or federal court in Connecticut and agreed not to contest such jurisdiction or venue. *See* Ex. A, ¶ 16.

50.    The ARCCE provides for attorneys' fees as follows:

> If any party to this Agreement breaches any terms of this Agreement, then that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

Ex. A, ¶ 18.

51.    The ARCCE also contains a Liquidated Damages provision, which entitles Gartner to liquidated damages in the event of a violation of Section 6 of the ARCCE, including a violation of the non-competition or non-solicitation provision. The ARCCE provides, in pertinent part:

> Employee agrees that, in addition to any and all other remedies available to the Company (at law, in equity, or as otherwise set forth in this Agreement), the Company shall be entitled to liquidated damages for any violation of Section 6 of this Agreement in an amount equal to: (i) the final twelve (12) months' salary, commissions, and bonus paid to Employee; and (ii) for any Employee

SG-21582300v1

who received stock pursuant to an RSU, PSU and/or SAR agreement or plan with the Company, an additional amount equal to the aggregate dollar value of shares underlying any stock appreciation rights, performance stock units, and/or restricted stock units that vested (or, in the case of stock appreciation rights, vested and Employee exercised) at any time during the twelve (12) months prior to separating from the Company. The dollar value of each such share shall be equal to the closing price of Gartner stock on the date of grant of the applicable stock appreciation right, performance stock unit or restricted stock unit. Employee agrees that the liquidated damages set forth herein are a reasonable estimate of the damages experienced by the Company for a violation of Section 6 of this Agreement, and are not to be deemed a penalty of any kind.

Ex. A, ¶ 6(d).

52.    The ARCCE also contains a tolling provision, which provides that in the event of a breach or violation of any of the covenants set forth in Section 6 of the ARCCE (and outlined above), the "restricted periods set forth in [] Section 6 shall be tolled until such breach or violation, or allegation thereof, has been duly cured or resolved, as applicable." Ex. A, ¶ 6(f).

**Gartner Protects Its Confidential Information**

53.    Gartner protected the confidential and proprietary information and trade secrets to which Riley had access by, among other things, password protecting all Gartner-issued devices and applications on which a Gartner employee may access such information and requiring employees to attend trainings and to affirm compliance with Gartner's Code of Conduct and other core policies, like Gartner's Data Protection Policy. In reliance on Riley's affirmations of these policies, Gartner provided Riley access to highly sensitive content that is unavailable to other Gartner employees.

54.    Additionally, Gartner requires employees with access to its confidential and proprietary information and its trade secrets to execute agreements substantially similar to the ARCCE.

SG-21582300v1

**SBI Pro and SBI's Research and Advisory Business**

55.     SBI is a "go-to-market advisory" firm focused on helping its clients grow revenue, margin, and enterprise value.  SBI offers services in go-to-market strategy consulting, business advisory services, sales training, and revenue operations.[1]

56.     SBI is incorporated in the State of Delaware and conducts business throughout the United States, including Connecticut, as well as internationally.

57.     In 2023, a few short months before hiring Riley away from Gartner, SBI "unveiled" SBI Pro, "a proprietary subscription-based advisory offering backed with an extensive platform comprised of best practice research, playbooks, tools, data, and benchmarks."[2]

58.     SBI further describes SBI Pro as a "subscription service designed to give growth leaders and their teams exclusive access to proven [go-to-market] methods, resources, and experts."  SBI Pro, according to SBI, is a "potent, effective affordable way to ensure you stay on your front foot to outpace the market."[3]

59.     SBI Pro offers services that directly compete with Gartner.  SBI boasts "unlimited access to a dedicated advisor and subject matter experts" and "world-class research, benchmarks and data" accessed through SBI's "database" and subscription research and advisory service." And, SBI's advisors "customize personal coaching" and "proactively surface[] insights and best practices on how to accelerate growth" for a specific industry.[4]

60.     Gartner, too, markets itself as "deliver[ing] actionable, objective insight to executives and their teams" and providing "[t]ools to make smarter, faster decisions."  Gartner's

---

[1] *See* https://sbigrowth.com/ (accessed September 3, 2024).
[2] *See* https://sbigrowth.com/news/sbi_taps_talent_to_lead_sbi_pro (accessed September 3, 2024).
[3] *See* https://unforgettable.sbigrowth.com/ (accessed September 3, 2024).
[4] *See* Home | SBI Pro - Outpace the competition (sbigrowth.com) (accessed September 3, 2024).

services include "one-on-one guidance from Gartner experts" on an organization's priorities and access to Gartner's research database.[5]

61.     Some of SBI Pro's research and advisory offerings include "commercial annual planning, compensation changes, sales kickoff, onboarding, and price changes to name a few."[6] Gartner offers the same research and advisory content.

62.     In 2023, SBI announced that Rick Karlton ("Karlton"), SBI Senior Vice President, would "spearhead" SBI Pro.[7]  Like Riley and Toman, Karlton is a former CEB/Gartner employee. In its press release announcing Karlton's "tap" to "lead SBI Pro," SBI highlighted Karlton's Gartner experience as the reason for his hire.

63.     SBI's Chief Executive Officer, Mike Hoffman ("Hoffman"), stated that "[Karlton's] extensive experience working with enterprise clients coupled with his time at Gartner makes him ideally suited to lead SBI Pro."  Hoffman further stated "[SBI's] clients thrive on data and access.  Both of which Karlton has a track record of delivering."  And, SBI touted that Karlton "led both the Sales and Customer Service client delivery teams at Gartner, and prior to Gartner, at CEB" and "led teams that co-developed, evangelized and advised on groundbreaking research efforts."[8]  This is the exact same team on which Riley now works at SBI.

64.     For his part, Karlton stated: "the opportunity to drive a new offering at an established organization was something [he] just couldn't pass up" and he was "looking forward to joining the amazing group of experts, consultants, and researchers who have been delivering outsized client growth outcomes through data, insight and critical tools."[9]

---

[5] *See* https://www.gartner.com (accessed September 3, 2024).
[6] *See* https://unforgettable.sbigrowth.com/ (accessed September 3, 2024).
[7] *See* https://sbigrowth.com/news/sbi_taps_talent_to_lead_sbi_pro (accessed September 3, 2024).
[8] *See id*
[9] *See id.*

65.     SBI, by its own words, is intentionally and actively expanding its "subscription" (*i.e.* syndicated) research offerings and SBI Pro business, and it is now competing with Gartner and trying to steal Gartner's market share.

66.     In light of SBI's new strategic direction and focus on research and advisory services, it has been targeting Gartner employees, like Karlton, Toman, Riley, and others, to join SBI in order to unfairly capitalize on the specialized training and unique knowledge Gartner provides its employees.  SBI's own press releases admit as much.

67.     SBI is intentionally targeting Gartner employees who worked in the SCS practice to leverage that exact knowledge.  And, as it relates to Riley, SBI can leverage Riley's very recent knowledge of and relationships with Gartner's customers in the SCS space as well.

68.     SBI is capitalizing upon Gartner's premier industry ranking – specifically by poaching Gartner's employees, like Riley – to increase its visibility in the industry.

69.     SBI is arming itself to unfairly steal Gartner's market share.  Riley's knowledge of Gartner's offerings, research agendas, key initiatives, strategy, and its client base will allow SBI to exploit Gartner's carefully compiled research and confidential information and client relationships, all developed at Gartner's considerable time and expense.

**Riley's Resignation and Employment with SBI**

70.     Riley tendered his resignation to Gartner in September 2023, with an effective last date of employment of October 3, 2023.

71.     At the time of his resignation, Riley told Gartner he was not leaving Gartner for another company and intentionally withheld information about his future plans.  He cited burnout as the reason for his resignation, adding that he would use the opportunity to rest and recharge.

72.     Approximately six months after leaving Gartner, Riley updated his LinkedIn profile to reflect an <u>April 2024</u> start date with SBI as a "Vice President."[10]

73.     SBI subsequently featured Riley in an "Unstoppable Person of the Week" LinkedIn post, lauding his many contributions to SBI's "commercial productivity research" since "joining [SBI] in <u>October</u>," not April as Riley represented.[11]

74.     SBI's own LinkedIn post further demonstrates Riley is, and has been, actively working on SBI's syndicated research and advisory services business, which is exactly what he did at Gartner as an Analyst and Chief of Research for SCS.

75.     Riley is working with Toman, Karlton, and other former Gartner employees to lead and aggressively grow SBI's subscription research business in the sales space. Riley has a deep understanding of what clients in this exact sector are looking for in terms of research and advisory services, and has deep relationships with clients and vendors that he can translate to SBI.

76.     SBI publicly applauded Riley's "insight pieces," webinars, and "1:1 discussions" in his new role with SBI.[12]

77.     Toman and Riley have already presented a webinar titled "Reviving Commercial Productivity," which discusses SBI's "latest research into today's B2B buying landscape" and the "implications to sellers, sales manager, and GTM executives." This is precisely the kind of expertise Riley acquired solely by virtue of his longstanding Gartner tenure. In SBI's post promoting the webinar, SBI prominently highlighted Riley's role as "Gartner's former Chief of Research for Sales and Customer Service."[13]

---

[10] *See* https://www.linkedin.com/in/craigmriley/ (accessed September 3, 2024).
[11] *See* SBI LinkedIn Post attached hereto as **Exhibit C**, which can also be accessed via: https://www.linkedin.com/company/sbi-growth/posts/?feedView=all (accessed September 3, 2024).
[12] *See id.*
[13] *See* https://sbigrowth.zoom.us/webinar/register/WN_GdmLpED3QfulT1Giqkupdg#/registration (accessed September 3, 2024).

78.    Riley has also authored at least "three powerful insight pieces" on "high productivity seller approaches, buyer friction, and vision-differentiation" for SBI, each of which are topics on which Gartner also publishes research and content.[14]

79.    SBI is unabashedly capitalizing on Riley's Gartner experience to gain more clients and exposure to implement its go-forward business plan.  Riley joins Karlton and Toman to continue to build this aspect of SBI's business and directly compete with Gartner.

80.    It will be impossible for Riley to perform in his role for SBI without using the information he learned and relationships he built during his years at Gartner.

**Gartner's Post-Employment Letters to Riley**

81.    On July 25, 2024, Gartner, through its counsel, sent Riley a letter regarding his post-employment contractual obligations to Gartner, attaching the ARCCE.  *See* Letter to Riley, **Exhibit D**.

82.    The letter to Riley sought specific assurances related to his post-employment obligations to Gartner.  Gartner also asked for information regarding his new roles with SBI in order to understand whether his employment with SBI breached the ARCCE and/or put Gartner's confidential, proprietary, and trade secret information at risk.  Gartner made an effort to assess Riley's new role with SBI and obtain information regarding his duties and responsibilities.

83.    Gartner's counsel also sent a copy of this letter to SBI, which included a copy of the ARCCE.  *See* Letter to SBI, **Exhibit D**.

84.    In response, counsel for Riley and SBI refused to provide any information to Gartner.  *See* Response, attached as **Exhibit E**.

---

[14] *See* Exhibit C.

85.     Neither Riley nor SBI provided Gartner with any requested assurances that his employment with SBI was not competitive with his role with Gartner and that SBI had taken steps to ensure protection of Gartner's confidential and trade secret information, nor did they provide any information whatsoever regarding his role with SBI.  *Id.*

86.     Since then, Gartner, through its counsel, has engaged in several attempts to work with SBI to address Gartner's concerns and avoid escalating the situation, both via phone call and written correspondence. *See* Second Letter to SBI/Riley, attached as **<u>Exhibit F</u>**.  SBI's and Riley's counsel has since refused to provide any of the information sought by Gartner in order to de-escalate the situation or provide Gartner with any assurances.

87.     Because SBI and Gartner perform the same services and compete for the same client base, especially with SBI's growth and expansion of SBI Pro, it will be impossible for Riley to perform his role at SBI without utilizing the proprietary information he learned about Gartner's clients, research, and strategies.

88.     Riley will rely upon and inevitably use this same sensitive, confidential and proprietary information to disrupt Gartner's client relationships and unlawfully steal Gartner's customer base.

89.     In employing Riley, SBI knew it was inducing a breach of his lawful contractual obligations to Gartner.

90.     SBI has induced a breach of the ARCCE for the purpose of harming Gartner, diminishing the value of its confidential information and trade secrets, and undermining its position in the industry.

91.      Defendants' actions will unfairly erode Gartner's competitive edge and allow them to enhance SBI's competitive business offerings with the depth of knowledge and industry experience that only Gartner employees have.

92.      Riley has direct knowledge of, among other things, Gartner strategic information concerning research and/or sales methodologies, playbooks, and strategic opportunities. Riley has a deep understanding and specialization in Gartner's SCS practice, client base, the priorities and needs of those clients (past, present, and future), and how to establish the kind of meaningful and trusting relationships that enable these clients to make the best possible decisions on the toughest challenges they have to confront. Riley also has intimate knowledge of Gartner's clients' priorities, preferences, and needs, as well as the products and services they have purchased from Gartner.

93.      Riley further has intimate knowledge of SCS's entire strategic plan for 2024 and beyond as it relates to research initiatives, trends, pressure points, MQ pipeline, client survey data, and content generally.  Riley knows everything there is to know about the research and content offerings underpinning the SCS vertical, and what makes Gartner's business successful in this specialized space.

94.      Riley's role at SBI necessarily will require his reliance on and use of this proprietary information to develop SBI's own competitive products, tools, and services and market them to Gartner's clients and prospective clients, all to Gartner's substantial detriment.

95.      SBI hired Riley to join his former Gartner colleagues and grow its competing business segment.  This will allow SBI to gain an unfair competitive advantage over Gartner and further induce Riley to unlawfully compete with Gartner.

96.     Gartner's business in this specialized space, including its relationships with its clients, employees, vendors, and other partners, remains at significant risk due to Riley's continued violation of his contractual obligations to Gartner, and SBI's inducement of such breach.

97.     Defendants' actions have damaged, and will continue to damage, Gartner.

98.     In particular, Defendants' actions have or will diminish the value of Gartner's confidential and proprietary information, harm Gartner's relationships with its customers and employees, and damage Gartner's goodwill, reputation, and competitive advantage.

**COUNT I**
**Breach of Contract – Non-Competition**
**(Injunctive Relief and Damages)**
**Against Riley**

99.     Gartner realleges and incorporates by reference Paragraphs 1 through 98 as though fully set forth herein.

100.    Riley entered into the ARCCE with Gartner on March 4, 2022.

101.    Gartner provided Riley with RSUs, continued employment, and access to and actual provision of confidential and proprietary information in exchange for executing the ARCCE.

102.    Among other obligations under the ARCCE, Riley agreed and was obligated, for a period of one (1) year following the termination of his employment with Gartner, to refrain from engaging in any "Competitive Acts" (as defined in the ARCCE).

103.    The ARCCE generally defines "Competitive Acts," in part, to include: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and/or (B) the direct or indirect provision of services to, or solicitation

21

of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

104.    The ARCCE is a valid and enforceable contract.

105.    The ARCCE protects Gartner's legitimate business interests, including its proprietary, confidential, and trade secret information, and its client and employee relationships.

106.    The ARCCE's terms are reasonable in that the non-compete provisions are temporally limited to only one (1) year post-employment.  The geographic scope is also reasonable considering the global nature of Gartner's business and client base.  Further, the scope of activity as it relates to the non-competition provision is limited to those businesses which directly compete with Gartner and put Gartner's proprietary, confidential, and trade secret information directly at risk.  Riley is not restrained from pursuing his occupation.

107.    These terms are fair and reasonable in order to protect Gartner's legitimate business interests.

108.    The ARCCE does not harm or interfere with the public interest.

109.    The terms of the ARCCE do not pose an undue hardship on Riley.

110.    Gartner has fully performed its contractual obligations to Riley under the ARCCE.

111.    The terms of the ARCCE are not greater than required for the protection of Gartner's legitimate business interests, including its confidential information and goodwill with its clients.

112.    SBI is a direct competitor of Gartner.  SBI is expanding and growing SBI Pro, its research and advisory business, which directly competes with Gartner.  SBI is looking to provide

subscription research and targeted advisory services to the CSOs and sales leaders, just like Gartner, with at least three former Gartner leaders at the helm.

113.    Gartner's business includes providing clients, including senior leaders and their teams within sales and customer service, among others, with enterprise-wide insights, advice, and tools to help them achieve their mission critical priorities.  Gartner's guidance and advice includes competitive analysis reports, industry overviews, market trend data, research notes, and product evaluation reports, and Gartner provides its clients with access to its world class teams of analysts and advisors, as well as technology management, technology selection, consulting, and conference services.

114.    At SBI, Riley, as a Vice President, is working in substantively the same roles he held at Gartner and publishing content on the same topics on which he worked at Gartner.  Riley is violating his ARCCE with Gartner.

115.    Riley violated the ARCCE by virtue of accepting employment with SBI, a Gartner competitor, to research, develop, produce, market or sell products or services that are competitive with the services he provided while at Gartner.

116.    Gartner has suffered and will continue to suffer damages as a result of Riley's breach of contract, including diminished value of its confidential information, damaged goodwill with customers, and loss of its competitive advantage.

117.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

118.    Riley's actions will continue to harm Gartner if not enjoined.

119.    Should the Court grant injunctive relief to Gartner, the burden on Riley would be slight compared to the injury to Gartner if injunctive relief is not granted.

SG-21582300v1

120.    Further, Riley agreed injunctive relief would be an appropriate remedy in the event he breached the ARCCE.

121.    Granting an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the ARCCE between the parties.

**WHEREFORE**, Gartner prays for judgment against Riley and requests the Court grant the following relief:

    A.  entry of a Preliminary Injunction and Permanent Injunction against Riley, enjoining him consistent with the terms of the ARCCE, including enjoining him from using or disclosing Gartner's trade secrets and proprietary and confidential information, and from committing further violations of his non-competition or non-solicitation obligations to Gartner, for the full term of such restrictions, as contemplated by the ARCCE's tolling provisions;

    B.  entry of a declaratory judgment in favor of Gartner, and against Riley, finding that the conduct complained of is illegal and unfair and violates the ARCCE between the parties;

    C.  for actual, compensatory, and exemplary damages to be determined at trial;

    D.  attorneys' fees and costs; and

    E.  such other and further relief the court deems just.

<u>**COUNT II**</u>
**Tortious Interference with Contractual Relations**
**(Injunctive Relief and Damages)**
**Against SBI**

169.    Gartner realleges and incorporates by reference Paragraphs 1 through 168 as though fully set forth herein.

24

170.    Riley signed a valid and enforceable ARCCE in which he promised, among other things, not to compete and not to disclose Gartner's trade secrets and confidential information.

171.    SBI hired Riley in a role substantively similar and directly competitive with his former role at Gartner.  SBI hired Riley into a role that necessarily requires him to breach his ARCCE, as his SBI employment constitutes a "Competitive Act" as defined in the ARCCE. Among other things, "[c]ompetitive [a]ct" is defined as: "(A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment."  ARCCE, Ex. A ¶ 6(a)(i).

172.    SBI had knowledge of the ARCCE and Riley's contractual obligations to Gartner. SBI knew its continued employment of Riley would cause him to breach his ARCCE with Gartner.

173.    Despite Gartner's efforts, SBI refused to engage with Gartner or provide any assurances regarding Riley's employment with SBI.

174.    SBI intentionally interfered with Gartner and Riley's contractual relationship by inducing him to breach his ARCCE by joining SBI.  SBI further interfered by inducing Riley to disclose trade secrets and confidential information and join a competitive business, especially considering SBI's launch of its SBI Pro business to directly compete with Gartner.  SBI hired Riley into a role similar to his Gartner position to draw directly on his knowledge of Gartner's business and experience gained at Gartner.

175.    SBI hired Riley into a role that will require him to engage in the research, development, production, marketing or selling of (or assisting others to do so) a product or service

that is competitive with the existing or planned products of Gartner with which Riley was intimately involved during his employment with Gartner. SBI has already hired a number of Gartner employees to further support Riley in his role at SBI.

176.    SBI's intentional interference with the contractual relationship between Gartner and Riley was improper and without justification. SBI knew Riley was bound by the restrictive covenants in his ARCCE yet, nevertheless, improperly induced and knowingly and intentionally employed him in violation of those covenants.

177.    SBI's actions were improper, unjustified, malicious, and in reckless disregard for Gartner's rights, entitling Gartner to damages. SBI induced Riley to violate his ARCCE in furtherance of SBI's scheme to hire former Gartner employees to build its workforce to unfairly compete with Gartner in its SBI Pro business. SBI has allowed and enabled Riley to take Gartner's confidential and proprietary information. SBI's unlawful scheme also seeks to increase its sales and generate more revenue at the expense of Gartner's business and with the help of Riley's, and others', knowledge and expertise.

178.    Gartner has suffered and will continue to suffer damages and irreparable harm as a direct result of SBI's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation, and loss of its competitive advantage.

179.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

180.    SBI's actions will continue to cause irreparable harm and damages to Gartner if not restrained.

**WHEREFORE**, Gartner prays for judgment against SBI and requests the Court grant the following relief:

A.  Entry of a Preliminary Injunction and Permanent Injunction against SBI enjoining it from interfering with Gartner's contractual relationships with Riley and other Gartner employees subject to valid and enforceable post-employment obligations;

B.  for actual, compensatory, and exemplary damages to be determined at trial; and

C.  such other and further relief the court deems as just.

### COUNT III
**Trade Secrets Misappropriation Under the Connecticut Uniform Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against All Defendants**

181.    Gartner realleges and incorporates by reference Paragraphs 1 through 180 as though fully set forth herein.

182.    The Connecticut Uniform Trade Secrets Act ("CUTSA") Conn. Gen. Stat. § 35-50 *et seq.*, prohibits the misappropriation of trade secrets.  Under the CUTSA, a trade secret means "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Conn. Gen. Stat. § 35-51(d).

183.    Under the CUTSA, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade

27

secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Conn. Gen. Stat. § 35-51(a).

184.    Gartner dedicated substantial time and resources towards developing its proprietary sales methodology, business methods and operations (including its various channels and industry verticals within its different business segments), research products, techniques, strategies, client lists, relationships with vendors, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information. In particular, Gartner's trade secrets include its sales methodology and techniques, research methodologies, its content and product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

185.    This information required substantial resources to develop, and it is not publicly known. At all relevant times, Gartner has made reasonable efforts to ensure its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only. Gartner requires password protection of all Gartner-issued devices and applications on which a Gartner employee may access such information. Gartner allows its

employees access to such information only after they have executed confidentiality and non-competition agreements, like the ARCCE. Gartner also requires its employees, including Riley, to undergo Data Protection Training as part of Gartner's provision of confidential information to employees.

186.    Riley had access to Gartner's confidential information and trade secrets. Riley had access to Gartner's proprietary and internal research that informed Gartner strategy and its research publications, client feedback, and vendor briefings, strategies to increase demand for Gartner's products in the SCS segment, direct client feedback informing Gartner's research, client trends, and in-demand issues. Riley also had intimate knowledge of SCS's research agendas, key initiatives, research and content pipeline, research trends, research strategy, and research pressure points, client survey data related to Gartner content and deliverables, and other verticals' research agendas across the entire organization.

187.    Riley, through his employment with Gartner, developed well-established and strong client relationships. Riley also has intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.

188.    Riley knows the identities of Gartner's SCS clients in a niche and specialized space, as well as the entire history of such clients' relationship with Gartner – and CEB before that – including their engagements, interests, and research priorities.

189.    Riley knew he had a duty to maintain the secrecy of Gartner's trade secrets due to his acknowledgement of such under the ARCCE.

190.    SBI is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

191.    SBI also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

192.    By virtue of Riley's new position with SBI, a direct Gartner competitor, Riley has threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of SBI.  These trade secrets include, but are not limited to, Gartner's proprietary information relating to its internal research that informed Gartner strategy and its research publications, client feedback, vendor briefings, strategies to increase demand for Gartner's products and services in the SCS practice, direct client feedback informing Gartner's research, client trends, and in-demand issues, Gartner's SCS research agendas, key initiatives, research and content pipeline, research trends, research strategy, and research pressure points, client survey data related to Gartner content and deliverables, other verticals' research agendas across the organization, client and prospect identities, and client and prospect engagement with Gartner.

193.    Riley has already published SBI content on topics very similar to the content on which he worked while at Gartner.

194.    Upon information and belief, SBI has not taken any actions to prevent Riley from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

195.    SBI undoubtedly hired Riley to benefit from his intimate knowledge of Gartner's trade secret, proprietary, and confidential information.

196.    In light of the similarities between Riley's Gartner and SBI roles, and the fact the companies are competitors, Riley will necessarily disclose or continue to disclose and utilize Gartner's trade secrets in the course of his SBI employment.

197.    It is impossible for Riley to separate the knowledge he acquired at Gartner from his parallel role at SBI, particularly where SBI is building, expanding, and pushing its SBI Pro research

and advisory business. For these reasons, he inevitably will disclose or continue to disclose, use and rely upon Gartner's trade secrets in his SBI role.

198.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

199.    Gartner has no adequate remedy at law for such present and future harm and, therefore, is entitled to equitable relief in addition to compensatory relief.

200.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

201.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.    Entry of a Preliminary Injunction and a Permanent Injunction against Defendants, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act, and any other applicable relief;

B.    For actual, compensatory, and exemplary damages to be determined at trial;

C.    For attorneys' fees in accordance with the Connecticut Uniform Trade Secrets Act; and

D.    Such other and further relief the court deems just.

31

## COUNT IV
### Trade Secrets Misappropriation Under the Defend Trade Secrets Act
### (Injunctive Relief and Damages)
### Against All Defendants

202.    Gartner realleges and incorporates by reference Paragraphs 1 through 201 as though fully set forth herein.

203.    The Defend Trade Secrets Act ("DTSA"), Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

204.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

205.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

206. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

207. Gartner dedicated substantial time and resources towards developing its proprietary sales methodology, business methods and operations (including its various channels and industry verticals within its different business segments), research products, techniques, strategies, client lists, relationships with vendors, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information. In particular, Gartner's trade secrets include its sales methodology and techniques, research methodologies, its content and product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

208. This information required substantial resources to develop, and it is not publicly known. At all relevant times, Gartner has made reasonable efforts to ensure its confidential and

33

proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner requires password protection of all Gartner-issued devices and applications on which a Gartner employee may access such information.  Gartner allows its employees access to such information only after they have executed confidentiality and non-competition agreements, like the ARCCE.  Gartner also requires its employees, including Riley, to undergo Data Protection Training as part of Gartner's provision of confidential information to employees.

209.    Gartner uses its trade secrets in its global work and necessarily in interstate commerce.

210.    The trade secrets hold independent economic value for Gartner and were developed at Gartner's considerable time and expense.

211.    Riley had access to Gartner's confidential information and trade secrets. Specifically, Riley had access to Gartner's proprietary and internal research that informed Gartner strategy and its research publications, client feedback, and vendor briefings, strategies to increase demand for Gartner's products in the SCS segment, direct client feedback informing Gartner's research, client trends, and in-demand issues.  Riley also had intimate knowledge of SCS's research agendas, key initiatives, research and content pipeline, research trends, research strategy, and research pressure points, client survey data related to Gartner content and deliverables, and other verticals' research agendas across the entire organization.

212.    Riley, through his employment with Gartner, developed well-established and strong client relationships.  Riley also has intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.

34

213.    Riley knows the identities of Gartner's SCS clients in a niche and specialized space, as well as the entire history of such clients' relationship with Gartner—and CEB before that—including their engagements, interests, and research priorities.

214.    Riley knew he had a duty to maintain the secrecy of Gartner's trade secrets due to his acknowledgement of such under the ARCCE.

215.    SBI is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

216.    SBI also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

217.    By virtue of Riley's new position with SBI, a direct Gartner competitor, Riley has threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of SBI.  These trade secrets include, but are not limited to, Gartner's proprietary information relating to its internal research that informed Gartner strategy and its research publications, client feedback, vendor briefings, strategies to increase demand for Gartner's products and services in the SCS practice, direct client feedback informing Gartner's research, client trends, and in-demand issues, Gartner's SCS research agendas, key initiatives, research and content pipeline, research trends, research strategy, and research pressure points, client survey data related to Gartner content and deliverables, other verticals' research agendas across the organization, client and prospect identities, and client and prospect engagement with Gartner.

218.    Riley has already published SBI content on topics very similar to the content on which he worked while at Gartner.

219.    Upon information and belief, SBI has not taken any actions to prevent Riley from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

220.    SBI undoubtedly hired Riley to benefit from his intimate knowledge of Gartner's trade secret, proprietary, and confidential information.

221.    In light of the similarities between Riley's Gartner and SBI roles, and the fact the companies are competitors, Riley will necessarily disclose or continue to disclose and utilize Gartner's trade secrets in the course of his SBI employment.

222.    It is impossible for Riley to separate the knowledge he acquired at Gartner from his parallel role at SBI, particularly where SBI is building, expanding, and pushing its SBI Pro research and advisory business.  For these reasons, he inevitably will disclose or continue to disclose, use and rely upon Gartner's trade secrets in his SBI role.

223.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

224.    Gartner has no adequate remedy at law for such present and future harm and, therefore, is entitled to equitable relief in addition to compensatory relief.

225.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

226.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

SG-21582300v1

A.  entry of a Preliminary Injunction and Permanent Injunction against Defendants, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act, and any other applicable relief;

B.  for actual, compensatory, and exemplary damages to be determined at trial;

C.  for attorneys' fees in accordance with the Defend Trade Secrets Act; and

D.  such other and further relief the court deems just.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Plaintiff Gartner, Inc. prays for the following relief:

1.  entry of a Preliminary Injunction and Permanent Injunction against Riley enjoining him from using or disclosing Gartner's trade secrets and proprietary and confidential information, and from committing further violations of his non-competition or non-solicitation obligations to Gartner, for the full term of such restrictions, as contemplated by the ARCCE's tolling provisions;

2.  entry of a Preliminary Injunction and Permanent Injunction against SBI, enjoining it from further interfering with Gartner's contractual relationship with Riley and from using Gartner's trade secrets and proprietary and confidential information;

3.  entry of a Preliminary Injunction and Permanent Injunction against Riley and SBI, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act;

4.  entry of a Preliminary Injunction and Permanent Injunction against Riley and SBI, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act;

5.   for actual, compensatory, treble, punitive and exemplary damages to be determined at trial;

6.   attorneys' fees and costs; and

7.   such other and further relief the court deems as just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gartner, Inc. hereby asserts its right to a trial by jury on all counts so triable.

SG-21582300v1

Dated: September 12, 2024

Respectfully submitted,

GARTNER, INC.

By:  */s Daniel A. Schwartz*
Daniel A. Schwartz (ct15823)
Claire Pariano (ct31579)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103
Tel: (860) 251-5038
DSchwartz@goodwin.com
CPariano@goodwin.com

Christopher Collins
Bar No.: CT29869
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

Mikela T. Sutrina
(*pro hac vice* admission pending)
Illinois Bar No.: 6273805
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
msutrina@sheppardmullin.com

Eric S. Schlichter
(*pro hac vice* admission pending)
Texas Bar No.: 24007994
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
700 Louisiana Street, Suite 2750
Houston, Texas 77002
Tel: (713) 431-7100
Fax: (713) 431-7101
eschlichter@sheppardmullin.com

*Counsel for Plaintiff Gartner, Inc.*

SG-21582300v1